In the Matter of:

Trujillo v. Atmos Energy Corporation

---

# HAROLD TRUJILLO

Date Taken:  January 20, 2012

---

**1640 Grant St., Suite 100**
**Denver CO  80203**

**FAX:  303.830.8505**
**depo@richardsonreporting.com**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 11-CV-01151-RBJ-MEH


HAROLD TRUJILLO,

Plaintiff(s),

vs.

ATMOS ENERGY CORPORATION, a Texas corporation,

Defendant(s).


DEPOSITION OF HAROLD TRUJILLO


555 17th Street
Denver, Colorado
Friday, January 20, 2012

PURSUANT TO NOTICE, the deposition of
HAROLD TRUJILLO, called for examination by the
Defendant herein, was taken in the offices of Holland
& Hart LLP, 555 17th Street, Denver, Colorado,
commencing at 9:00 a.m. on January 20, 2012, before
Sherry A. Richardson, a Registered Professional
Reporter, Certified Shorthand Reporter, and Notary
Public in and for the State of Colorado.

1    time, we make it very hard on our court reporter, and

2    we don't want to do that.

3            A.   Okay, I won't.

4            Q.   It's normal for people to talk over each

5    other in conversation, and that's fine, and we

6    understand each other.  It's just difficult in this

7    context for the court reporter.  We want to make sure

8    we have a clear record.

9                 The other thing, and again, you are

10   already doing it well, if the question calls for a yes

11   or a no answer, I'd ask that you answer yes or no

12   rather than with a shake or a nod of the head or an

13   nuh-uh or an uh-huh, which sometimes are difficult to

14   distinguish when we have the record later.  Okay?

15           A.   Yes, sir.

16           Q.   Do you any questions about the process?

17           A.   I've never done one of these; so I don't

18   know what to ask.

19           Q.   Okay.  Fair enough.  And if you have any

20   questions as we go along, I'm sure your counsel can

21   straighten them away, or let me know, and we will try

22   and take care of it as we go along.  Okay?

23           A.   That sounds good.

24           Q.   Why do you believe that you were

25   discriminated against by Atmos based upon your race or

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO   January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 9

 1   national origin?

 2           A.   Because I was -- there was only two of

 3   us let go the same age, same race.  Pretty much the

 4   same age.  The other two weren't let go.  Nobody else

 5   was told anything.

 6           Q.   Any other reasons other than that?

 7           A.   From the past or from that day?

 8           Q.   From anytime.  I want to know why you

 9   think you were let go due to your race or national

10   origin.

11           A.   Well, that one is hard to answer.  But I

12   know I would have never been there if Roger Matthews

13   would have still been there.  He was the other welder.

14   And they always gave him all the work.  And they had

15   me doing line locates and stuff.  But he had quit; so

16   that's the reason I was there.

17           Q.   Help me to understand.  What does Roger

18   Matthews not having still been there have to do with

19   your belief that you were terminated because of your

20   race or national origin?

21           A.   I didn't hear all that.  Can you repeat

22   it?

23           Q.   What does Roger Matthews not having

24   still been there have to do with your belief that you

25   were fired because of your race or national origin?

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

 1              A.   Because they always gave him the work.

 2   Even though we both did the same type of work, they

 3   always gave him the welding work instead of me.  And

 4   the only reason they gave it to me was because I was

 5   the only one there.

 6              Q.   During the time you worked at Atmos, did

 7   any of your supervisors ever make a derogatory comment

 8   to you about your national origin or your race?

 9              A.   They would, you know, they would ask me

10   what part of Durango, Mexico, I was from.  They would

11   ask me if I ever visited Mexico.  It was mostly

12   joking, I thought.  But I would tell them, no, I don't

13   visit Mexico because they might not let me back out.

14              Q.   So you joked back to them?

15              A.   Yeah.

16              Q.   When you say they said that, who made

17   the comment to you about were you from Durango,

18   Mexico, or did you visit Durango, Mexico?

19              A.   Mostly Troy Thatcher.  He was quite the

20   jokester.

21              Q.   When he would make those jokes to you,

22   you understood them as jokes.  Is that right?

23              A.   That's what I thought they were, yeah.

24              Q.   And you would joke back to him?

25              A.   Yeah.  Yeah.  Because, I mean, he knew,

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO   January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 11

1   he knew I was in Durango, born and raised in Durango

2   but --

3           Q.   Did anyone other than Troy Thatcher make

4   a comment to you about your race or your national

5   origin, that you recall?

6           A.   No, sir.

7           Q.   What do you consider your race to be?

8           A.   Hispanic, I guess.

9           Q.   What do you consider your national

10  origin to be?  Same thing?

11          A.   Same thing or -- I don't know.  I guess

12  when you fill out a work application, they have you as

13  a Navajo or native, native American.

14          Q.   Are you native American?

15          A.   Not that I know of.

16          Q.   Okay.  So you would just consider

17  yourself to be, I don't mean just, but you would

18  describe yourself as being Hispanic?

19          A.   Yes.

20              (Exhibit 1 was marked.)

21          Q.   Mr. Trujillo, let me hand you what has

22  been marked as Exhibit 1.  That is a copy of the

23  Charge of Discrimination that you filed with the

24  federal Equal Employment Opportunity Commission or

25  EEOC.  And it appears that you filed that on January

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO   January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 14

```
 1             A.   Why did I sign it?  Because this is the

 2   only paper that Civil Rights sent me.  And they told

 3   me, Sign it and get it back to us.

 4             Q.   Did you try and communicate with anybody

 5   at the EEOC to the effect that, Hey, there is

 6   something on here that is incorrect; we need to change

 7   it?

 8             A.   No, sir.  I didn't even think about

 9   that.

10             Q.   Going down further to Section 3-A, it

11   says, On or about April 21, 2009, I was sent to the

12   work site by the operations supervisor.  I had no

13   reason to believe the trench I was working on to be

14   unsafe.

15                  I want to focus on that sentence for a

16   moment.  You know we're talking about the trench in

17   front of La Plata Electric Association next to

18   Colorado Highway 160 in Durango, right?

19             A.   Yes, sir.

20             Q.   And that's the trench that's at the

21   center of this case, right?

22             A.   Yes, sir.

23             Q.   Okay.  When you came to the site on

24   April 22, you knew that that trench had not been dug

25   in compliance with OSHA's trenching standards,
```

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO   January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 15

1    correct?

2         A.   Yes, sir.

3         Q.   Okay.  And, in fact, you had a

4    discussion to that effect with the other members of

5    your crew.  Correct?

6         A.   I did.

7         Q.   So the sentence that says, I had no

8    reason to believe the trench I would be working in was

9    unsafe, that's not a correct statement, is it?

10        A.   No.  It is.  It's a correct statement.

11        Q.   How is that statement true when you knew

12   that the trench had not been dug to OSHA safety

13   standards?

14        A.   When my supervisor sent me there, I just

15   do what my supervisor says.  I go there.  When I got

16   there and I looked at it, it was different.

17        Q.   Did your supervisor -- when you say your

18   supervisor, let's use that person's name.  That's Troy

19   Thatcher?

20        A.   Yes, sir.

21        Q.   Did Troy Thatcher say that trench,

22   referring to the trench on the job we described, did

23   he say to you, That trench is safe?

24        A.   No, sir.

25        Q.   Did he tell you that that trench had

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

```
 1    of perjury that the foregoing is true and correct,

 2    right?

 3              A.    Right.

 4              Q.    When you received this form, did you

 5    say, Hey, wait a minute.  It's incomplete.  You left

 6    out race and national origin, that I was discriminated

 7    against on those grounds?

 8              A.    No, I didn't say anything.  I just

 9    filled out the paper.

10              Q.    When you had your conversation with the

11    person from the CCRD that led to the preparation of

12    Exhibit 2, did you tell them that you thought you had

13    been discriminated against not only on the basis of

14    age but also national origin or race?

15              A.    Actually, she is the one that told me

16    that if it was age and racial, to check them both.

17              Q.    And when she told you that, did you say,

18    Yeah, that's what we should do; we should check them

19    both?

20              A.    No, I didn't say that.

21              Q.    With reference to Deposition Exhibit 2

22    in Section 4, you say at the end of that paragraph,

23    and there is kind of a subheading 3, it says, Prior to

24    the date of my filing, I had notified the respondent

25    of my plans to not retire for another four more years.
```

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO  January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 19

1    It is of my belief that for disclosing this

2    information, I was discharged.  Is that a true

3    statement?

4              A.   Yes.  I talked to Troy Thatcher about

5    that.

6              Q.   What did you tell Troy?

7              A.   Actually, Troy asked me when I was going

8    to retire.  He said, Grandpa, when are you retiring?

9    And I says, I don't know, probably when I turn 65, I

10   told him.

11             Q.   Did Troy tell you why he was asking you

12   that?

13             A.   No, not really.  He just said, We're not

14   going to let you retire.  He said, You're one of our

15   main guys.  And I says, I've got to retire sometime.

16                  And he said, Well, when you retire we

17   will probably bring you back so you can do some

18   training.  And I said, That sounds good to me.  I

19   said, Just give me a year off so I can fix my house.

20   But we left it at that.

21             Q.   Okay.  Were you offended at the time

22   when Troy asked you about, When are you going to

23   retire?

24             A.   No, sir.

25             Q.   When he told you that, We're not going

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO   January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 20

1    to let you retire, and if you retire we want to bring

2    you back, that made you feel good, right?

3         A.    Yes, it did.

4         Q.    It made you feel wanted, made you feel

5    appreciated?

6         A.    Yes, sir.

7         Q.    Why do you believe that your disclosing

8    the fact that you intended to retire in four years was

9    the reason that you were discharged?

10        A.    Mostly because they were -- I think they

11   were looking for the older guys to get retired because

12   of the money they were paying us.  You know, they

13   could get somebody younger in there for less money.

14   And to me, they were just looking for excuses.

15        Q.    Excuses for what?

16        A.    To get rid of us.

17        Q.    Did you ever hear anyone in Atmos

18   management make a statement to the effect that they

19   wanted to get rid of you because of your age?

20        A.    No, sir.

21        Q.    Did you ever hear anyone at Atmos

22   management make a statement that they wanted to get

23   rid of you because your salary was too high?

24        A.    No, sir.

25        Q.    Did you ever hear anyone at Atmos

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

1          A.   Right.

2          Q.   Who dug the trench?

3          A.   Danny Lucero was supposed to have dug

4     the trench.

5          Q.   When you say it that way, it makes me

6     think maybe it didn't happen that way.   Who actually

7     dug the trench?

8          A.   I would say Danny Lucero did.

9          Q.   Do you know whether anybody else

10    assisted him digging that trench?

11         A.   JT would play with the backhoe once in a

12    while, but he wasn't supposed to be.

13         Q.   Okay.   The other members of your crew

14    were Danny Lucero, JT Duvfa, and Sterling Balliger?

15              MR. NEMECHEK:   Objection.   Form and

16    foundation.   You can answer.

17         A.   Balliger?

18         Q.   Yes.

19         A.   Yes, sir.

20         Q.   When you got there to weld the half

21    stoppers, were those other three persons present?

22         A.   They showed up later, yes, sir.

23         Q.   Did you have any discussion that day

24    with any of the three of them about the condition of

25    the trench?

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO   January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 40

```
 1              A.   Yes, sir.  I had it with all three of
 2    them.
 3              Q.   As a group or individually?
 4              A.   Pretty much as a group, yeah.  They were
 5    all there.
 6              Q.   Tell me what you said and what anybody
 7    else said with respect to the condition of the trench.
 8              A.   Actually, what was said is Sterling --
 9    let me go back.  When I set the half stoppers on
10    there, it looked pretty tight to me to get the valve
11    on there.  So I took my tape measure out and measured,
12    see if we had enough room.
13              Q.   What were you measuring?
14              A.   I was measuring the width of the ditch
15    to see if we could get the half stoppers, the valve on
16    there.  I don't remember.  The valve might have been
17    about 2 feet in length, you know.
18                   And Sterling Balliger came up --
19              Q.   Let me stop you for one second.  You
20    measured the width of the trench.  Did you measure the
21    depth?
22              A.   Yes, sir.
23              Q.   What was the depth of the trench?
24              A.   Four seven.
25              Q.   Was the trench the same depth throughout
```

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO  January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 41

1  the entire trench?  Or were some parts higher and some

2  parts lower?

3           A.   The south end was about four seven.   I

4  guess you would say the northwest end was, oh, I would

5  say 29 inches.

6           Q.   So it was not nearly as deep.

7           A.   Oh, no.

8           Q.   Okay.  So is it fair to say that four

9  seven was the deepest part of the trench?

10           A.   Yes, sir.

11           Q.   As you measured it?

12           A.   Yes, sir.

13           Q.   Please continue to tell me the story of

14  what was said then.

15           A.   Okay.  I was measuring to set the

16  valves, see if they would fit.  Sterling Balliger came

17  up to me, looked like he was kind of mad.  I don't

18  know what his problem was.

19               But he came up to me and he says, There

20  is nothing wrong with that ditch.  And I said, I

21  didn't say there was.  He says, What are you measuring

22  for?  I said, See if the valve fits.  We have got to

23  get the fittings in here.

24               He said, Oh.  I said, But this ditch

25  isn't to OSHA specs.  He said, What do you mean?

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO   January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 42

1   There is nothing wrong with the ditch.   I said, I

2   didn't say there was.   I said, The ditch is good.

3   There is nothing unsafe about it other than the spoil

4   that's too close.   It's got to be 2 feet 30 inches

5   away.   It's only 6 inches.

6              And he said, Well, no, it's further than

7   that.   And I said, No, it ain't.   I took my tape, and

8   I measured where the edge of the spoil was.

9              At that time Danny Lucero came up.   And

10  he said he didn't have no place to put the spoil.   And

11  I said, Well, you should have dug it a little wider.

12  And he said, I can't do that because we have got sewer

13  lines; we have got phone lines; we have got property

14  pins; we have got water lines.

15             And I said, So what?   We have always had

16  that.   We have still got to dig around them.   He said,

17  This is as good as it's going to get.   And I said,

18  Okay.

19             So I went on with my job.   We got the

20  machinery, set it on there, and we tapped it.

21        Q.   During this conversation did you tell

22  either Sterling or Danny that you weren't going to go

23  in that trench until it complied with OSHA standards?

24        A.   No, sir, I didn't.

25        Q.   You knew that it did not comply, right?

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO  January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 43

1           A.   As far as the spoil, yes, sir.

2           Q.   And, in fact, you said that to Sterling,

3    right?

4           A.   I did.

5           Q.   But even though you knew that the ditch

6    did not comply with OSHA standards, you still went

7    into that ditch and performed your work in that ditch,

8    correct?

9           A.   Yes, sir.

10          Q.   After you realized that the ditch did

11   not comply with OSHA standards, did you try to call

12   Troy Thatcher to tell him that the ditch did not

13   comply?

14          A.   No, sir.

15          Q.   Did you attempt to call Russell Murph

16   and tell him that the ditch did not comply?

17          A.   No, sir.

18          Q.   Did you attempt to call anyone else in

19   Atmos management to tell them that the ditch did not

20   comply?

21          A.   No, sir.

22          Q.   Anyone in human resources at Atmos?

23          A.   No, sir.

24          Q.   Did you attempt to utilize the company

25   hotline to advise anyone in the company that the ditch

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

1    did not comply?

2              A.    No, sir.

3              Q.    Are you familiar with the term

4    "competent person" under OSHA's trenching and

5    excavation standards?

6              A.    Yes, sir.

7              Q.    Tell me what that is.

8              A.    I'll tell you what I know about it.

9    That's when they give you training on how to dig a

10   trench to the way OSHA expects it to be dug.

11             Q.    And you had received training in being

12   qualified as a competent person, right?

13             A.    Yes, sir.  We all did.

14             Q.    But you had received competent person

15   training back in 2002, correct?

16             A.    Yes, sir.

17             Q.    And we can look at some records that

18   confirm that.  But you had received competent person

19   training, right?

20             A.    Yes, sir.

21             Q.    And then you had received refresher

22   courses on a number of occasions after that initial

23   training, right?

24             A.    A couple of more times I believe, yes.

25             Q.    Okay.  And under OSHA's standards,

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

1    before you can dig certain kinds of trenches, trenches

2    of a certain depth and so forth, you have to have a

3    competent person on the job, right?

4              A.   Yeah.  I would suppose so, yes.

5              Q.   Okay.  To make sure that OSHA standards

6    are being complied with?

7              A.   Right.

8              Q.   And as of the time this ditch was dug

9    beside Highway 160 in front of La Plata Electric

10   Association, you were a competent person.

11             A.   Yes, sir.

12             Q.   Do you know whether anybody else on your

13   crew had been qualified as a competent person?

14             A.   Yes, sir.

15             Q.   Who was?

16             A.   Danny Lucero and Sterling Balliger.

17             Q.   Was JT Duvfa?

18             A.   No, sir.  I don't think he had gone

19   through the training yet.

20             Q.   Of the four persons on the crew, who was

21   the most senior?  Was that you?

22             A.   No.  Danny Lucero was.

23             Q.   He was senior to you?

24             A.   Yeah.  He had been there two to three

25   years before me.

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

1    just -- off the sidewalk you could step into the

2    ditch.

3              Q.   But there was work that needed to be

4    done at the south end, right?

5              A.   Both ends.

6              Q.   And when you were working at the south

7    end, was there appropriate ingress and egress in

8    accordance with OSHA standards?

9              A.   No, sir.

10             Q.   Did you raise that issue with the rest

11   of your crew?

12             A.   Yes, sir.

13             Q.   Who did you raise it with?

14             A.   Danny Lucero.

15             Q.   What did you say to him, and what did he

16   say to you on that issue?

17             A.   He said, It ain't that deep.  He said,

18   You can jump in.

19             Q.   So after you had discussions with the

20   rest of your crew about the condition of the trench,

21   you told me earlier that you got in the trench and

22   started to do your job.  Right?

23             A.   Yes, sir.

24             Q.   At some point in time, did an OSHA

25   inspector come and visit the job site?

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO   January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 54

1          A.   On the day that he showed up was the
2  only time I seen him.
3          Q.   Was that the first day that you were on
4  site?
5          A.   No, sir.  He wasn't there when I set the
6  half stoppers.
7          Q.   When did the OSHA inspector come?
8          A.   I believe it was on a Tuesday, the next
9  day after we tapped it.
10          Q.   So you welded at the yard one day.  You
11  set the half stoppers the next day.  And the OSHA
12  inspector came on the third day?
13          A.   On the day we cut the leg, yes.
14          Q.   Was that the third day that you were
15  involved in the project, second day you were actually
16  on site?
17          A.   Second day I was actually on site.
18          Q.   Tell me what happened when the OSHA
19  inspector came.
20          A.   I don't know.  I didn't even see him.  I
21  was in the -- I was at the motel using the restroom
22  and getting a drink of water.
23               And when I came out of the motel,
24  everything was shut down.  The highway was doing their
25  project.  And I came out, and nobody was around except

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO   January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 55

 1     for Danny Lucero and Sterling and JT.  And they were
 2     talking to this man.
 3              Q.   Okay.
 4              A.   And I said, What's the deal here?
 5              Q.   Tell me what happened when you came back
 6     from the restroom.
 7              A.   Well, I walked over.  At that time
 8     Mr. McWilliams, the OSHA inspector, walked over to me,
 9     introduced himself, and asked me my name.  And I told
10     him my name.
11              And he says, Are you in charge here?
12     And I said, No, sir, I'm not.  I kind of laughed, and
13     I said, No, sir, I'm not.  I said, Our supervisor is
14     in Tennessee on training.
15              And he said, Well, those three guys over
16     there told me you were in charge.  And I said, No,
17     sir, nobody left me in charge.  I said, I'm just here
18     doing the welding.
19              I said, Actually, I thought Mr. Lucero
20     was in charge because they sent him up here to prep
21     the hole for me.  I said, I was just supposed to come
22     up here, set the half stoppers, cut the pipe, put the
23     pipe back together.
24              And he says, Well, he said, Don't worry
25     about it.  He said, Nobody is in trouble here.  He

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO   January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 72

```
 1            A.   Yes.
 2            Q.   Okay.  You do remember meeting in person
 3   with Mr. Murph on April 24?
 4            A.   Yes, sir.
 5            Q.   And you told Mr. Murph that, yes, you
 6   had received competent person and excavation safety
 7   training, correct?
 8            A.   I did.
 9            Q.   He showed you your training reports, and
10   you agreed that you had received the training that
11   they reflected?
12            A.   Yes, sir.
13            Q.   He showed you your ESS training records
14   and discussed safety meetings and training dates with
15   you?
16            A.   Yes, sir.
17            Q.   He asked you with all the training and
18   the experience and policy awareness why you would
19   choose not to follow those procedures.  He asked you
20   that, right?
21            A.   I believe he did, yes.
22            Q.   And you told him you had no idea.
23   That's what you said, right?
24            A.   Yes.
25            Q.   You told him all the holes our guys dig
```

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO  January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 74

```
 1   you said, It would have been better if it was wider.

 2   But if I couldn't get them to dig it deeper, do you

 3   think I could get them to dig it wider?

 4           A.   That's right.

 5           Q.   He asked you, he said, So to you it

 6   wasn't safe?  And you said, no, it wasn't safe; you

 7   were just tired of bitching about it.

 8           A.   No, I told him the ditch was safe.  I

 9   said it was just too narrow.  He said, Was it too

10   deep?  And I said I didn't think it was too deep.  And

11   he said, Was it safe?  And I said, If it wouldn't have

12   been safe, I said, I would never have got in it.

13           Q.   Did you tell him, no, it wasn't safe, I

14   was just tired of bitching about it?

15           A.   No, sir.  I told him I was tired of

16   bitching about the guys not digging it right, I said,

17   because I have said it and said it over and over

18   again.  But I don't know.  He just wrote it down.

19           Q.   He asked you, Knowing it wasn't safe

20   based on your training experience, why did you get in

21   the ditch?  He asked you that, right?

22           A.   Yes, sir.

23           Q.   And you said the job had to get done.

24           A.   Yes, sir.

25           Q.   You said, They weren't going to change
```

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO  January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 77

```
 1    that means either.
 2              Q.   In your dealings with Russell Murph, did
 3    you find him to be somebody who is honest?
 4              A.   I thought he was at the time, yes.
 5              Q.   Somebody who told the truth, in your
 6    experience with him?
 7              A.   As far as -- I didn't know him that
 8    much.  I've only known him about two months.  And I
 9    thought -- I thought he was an all-right guy.  He
10    liked to fun around a lot, too, you know.
11              We never talked much about work.  Just
12    when he showed up in Durango, it was over lunch and
13    having a good time mostly.  Telling us how good of a
14    job we were doing.
15              And he gave us a meeting on the baby
16    boom.  He said there was 30 percent of the company
17    that was working for the company that was getting
18    ready to retire.
19              And he said, When they do retire, he
20    said, including yourself, he said, when you guys do
21    retire, he said, we're going to be hurting.  And he
22    also said at that time, We might have to ask some of
23    you guys to come back and help us train the young
24    guys.  But I -- I wasn't thinking about retiring yet.
25              Q.   You understood him to be telling you how
```

Richardson Reporting Service   303-830-8488

HAROLD TRUJILLO  January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 78

1   valuable you experienced employees were, right?

2           A.   Yes, sir.  They bragged about it a lot.

3   According with me and Danny, they had our pictures on

4   the wall.  And they said, There is golden years of

5   experience there, which, you know, we had been --

6   Danny had been doing it for 28, 29 years, and I had

7   been doing it for 25 so --

8           Q.   Back to the meeting with Russell Murph

9   on the 24th.  Did he ask you why you did not shut the

10  job down?

11          A.   He did.

12          Q.   And you told him, I didn't know that I

13  could.  When I've complained in the past, the boss

14  would say it is okay.

15          A.   That's correct.

16          Q.   That's what you told him?

17          A.   Yes, sir.

18          Q.   When you were referring to "boss," who

19  was that boss?

20          A.   Whoever was in charge at the time.  It

21  was different occasions.  I worked -- I worked

22  everywhere.  I worked Cortez and Mancos, Deloris, Dove

23  Creek.  It all depends where we was at.  There was a

24  lot of shortcuts taken a lot of places, you know.

25          Q.   Can you give me a specific example of

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

1    and they just push everything in.  Warning tape is,

2    when you dig it up again, it's 2 feet away from the

3    pipe when it should be over the pipe.

4              And he said, Troy told me, he said,

5    That's why we're not going to put warning tape in

6    there no more.  I said, That's a big mistake.

7          Q.   You told Murph that some of the ditches

8    don't even have warning tape?

9          A.   I don't believe I told Murph.  I told

10   Mr. Thatcher that.

11         Q.   Do you recall Mr. Murph asking with

12   respect to the excavation in front of LPEA that, If it

13   wasn't right, who could you call?  He asked you that?

14         A.   He did.

15         Q.   And you said, I could call a boss?

16         A.    Correct.

17         Q.   And he asked, Who?  And you listed Troy,

18   you -- Murph -- Jed, or Rob?

19         A.   I believe I did.  Yes.  I forgot to put

20   Pottorff in there.  But I wasn't even thinking at that

21   time.

22         Q.   He asked you what example of safety are

23   you setting for new employees?

24         A.   He did.

25         Q.   And you said, We're not.

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

1          A.    Correct.

2          Q.    And you said, We're saying whether it's

3   safe or not, do your job, and that's what I've been

4   doing since I've been here?

5          A.    Correct.

6          Q.    He asked you what safety meant to you,

7   right?

8          A.    Correct.

9          Q.    And you told him, Go home, see the old

10  lady, drink a beer, see the grandbabies, fishing and

11  hunting, life at the end of the day unhurt.

12         A.    Correct.

13         Q.    He asked you did you know better than to

14  leave a ditch like that?

15         A.    I believe he did, yes.

16         Q.    And you said yes.

17         A.    Yes.

18         Q.    And he asked you, Should you have let

19  anyone enter that ditch, and you told him no.

20  Correct?

21         A.    I told him no.   I said, But I didn't see

22  nothing wrong with the ditch.

23         Q.    Well, you told him that you knew the

24  ditch didn't comply with OSHA standards, right?

25         A.    According to the spoil pile, yes.

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

 1    anybody else in management during that time period?

 2            A.   No, sir.  After that -- after I fixed

 3    that leak, Mr. Murph sent me home with pay until the

 4    Feds did their investigation, he told me.

 5            Q.   Okay.

 6            A.   I never did see any Feds down there, but

 7    I don't know what he meant.

 8            Q.   You were terminated on May 12?

 9            A.   I believe so, yes.

10            Q.   Tell me what you remember about that.

11    What happened?

12            A.   Well, I was at home cleaning the yard

13    and all that stuff, cleaning after the dog, and my

14    phone rang, because Murph told me, Take your phone

15    home but don't answer it unless it's Troy.  I said

16    okay.

17            So when I seen Troy's name on it, I

18    answered it.  And he says, Can you come down to the

19    office?  And I said sure.  And I told my wife, I said,

20    Well, maybe it's time to go back to work.

21            So I jumped in my welding truck, and I

22    went down there.  And Russell Murph and Troy Thatcher

23    and Cara Smith were there.  They were nice and polite.

24    And they asked me how I had been, what I was doing,

25    and, you know, we just talked.  And I said fine.

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO  January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 101

1    because of the OSHA violation.  And I said, And I've

2    raised complaints about it before, but nothing was

3    ever done.  I didn't say that's why I was terminated,

4    though.

5            Q.   Is it your belief that you were

6    terminated because you had complained in the past

7    about safety issues?

8            A.   No, sir.  I believe I was terminated

9    because of my age and my race.

10           (Exhibit 10 was marked.)

11           Q.   Let me hand you what has been marked as

12   Exhibit 10.  That's a handwritten log that was

13   produced by you in this case.  Do you recognize that?

14           A.   Yes, sir.

15           Q.   And it starts July 4, 2008, and goes up

16   to on the last page, June 3, 2009.  Do you see that?

17           A.   Last page -- okay.  I see it.

18           Q.   Okay.  So that's the period of time

19   that's covered by this log, right?  July 4, 2008, to

20   June 3, 2009?

21           A.   Actually, yeah.  This is part of my

22   notebook that I used to keep a log of what I did all

23   day long.

24           Q.   Okay.  How would you refer to it?  Your

25   notebook or your log or your diary?  What would you

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO   January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 122

```
 1          A.    Oh, yes.

 2          Q.    Okay.  Read through that paragraph to

 3   yourself and let me know when you're done.

 4          A.    Okay.

 5          Q.    You read through that?

 6          A.    Yes, sir.

 7          Q.    Does that paragraph accurately reflect

 8   what occurred with respect to your termination meeting

 9   on May 12, 2009?

10          A.    Yes, sir.  That's when they called me.

11          Q.    And what you have written down here is

12   what happened at that meeting?

13          A.    Yes, sir.

14          Q.    Mr. Trujillo, I've read through all of

15   the entries in Deposition Exhibit 10 for the period

16   July 4, 2008, on through the date of your termination

17   and on beyond to June 3, 2009.

18                There is no entry in there that reflects

19   you complaining about anyone calling you grandpa at

20   Atmos Energy, is there?

21          A.    I didn't think I had to at the time.

22          Q.    Well, my question is, is there anything

23   in there where you complain about being called

24   grandpa?  And I will tell you that I have read through

25   it, and I didn't see anything.
```

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO  January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 123

1          A.   No.  I never complained.  I just thought
2    they were joking around.
3          Q.   And there is nothing in Exhibit 10 in
4    any of those entries that reflect that you complained
5    to Atmos management about any safety issues.  Correct?
6              MR. NEMECHEK:  Objection, form and
7    foundation.
8          Q.   You can answer.
9          A.   There -- repeat the question, please.
10         Q.    There is nothing in Exhibit 10 that
11   reflects you complained to Atmos management about any
12   safety violations.
13         A.   No.  Other than Troy, no.
14         Q.   And we looked at those entries where you
15   told Troy he needed to put on his hardhat and vest.
16   And you told me earlier -- we saw some entries where
17   Troy showed up on your work site, sometimes just
18   briefly, where he didn't have his vest or hardhat on,
19   right?
20         A.   Yes, sir.
21         Q.   You told him he needed to put it on.
22   And sometimes he did, and sometimes he didn't.  Right?
23         A.   Yes, sir.
24         Q.   And you didn't complain to anyone in
25   upper management about Troy.

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

```
 1            Q.   Mr. Trujillo, let me hand you what has

 2    been marked as Deposition Exhibit 12.  That's a copy

 3    of the determination letter that was issued by the

 4    Colorado Civil Rights Division.  It's dated June 17,

 5    2010.  That date actually appears on the

 6    next-to-the-last page.

 7                 Have you seen this before?

 8            A.   Yes.

 9            Q.   Turn to page 2, please.  And there in

10    the one, two, third full paragraph, there is the

11    statement, The charging party, that's you, maintains

12    that during his tenure with the respondent, that's

13    Atmos, he repeatedly reported safety violations to the

14    respondent but was shirked.  Do you see that

15    statement?

16            A.   Yes.

17            Q.   Is that a true statement?

18            A.   I don't know what "shirked" means.

19            Q.   I was going to ask you about that.  I'm

20    not sure what that means either in the context.

21                 MR. NEMECHEK:  Objection, form.

22            Q.   I think he used the wrong word in there,

23    is what I think, but anyway.

24                 That paragraph goes on to say towards

25    the end of the paragraph, The charging party maintains
```

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO  January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 128

1   that he was often called "grandpa" by his supervisor

2   and others.  Do you see that statement?

3           A.   Yes, sir.

4           Q.   Who called you grandpa?  You've

5   referenced that a couple of times or several times

6   today.  Who called you grandpa?

7           A.   Troy Thatcher, Ron Wakefield, Pat

8   Maloney, Penny -- Penny Fugate.

9           Q.   What's her last name?

10          A.   Fugate.

11          Q.   So Troy, Ron, Penny, and who is the

12  other person?

13          A.   Pat Maloney.

14          Q.   What was Ron Wakefield's position?

15          A.   As far as I know, he was just a general

16  plant operator, distribution operator, same as all of

17  us.

18          Q.   Same as you?

19          A.   Yes.

20          Q.   What was Pat Maloney's position?

21          A.   He is considered a -- he was the

22  engineer.  But he was -- they said something else here

23  what he was considered as.  I can't remember.  He

24  was --

25          Q.   Just tell me what you understood it to

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO  January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 129

1   be.

2        A.   He would look over jobs, new jobs that

3   were coming up.  He would line them up for us to go

4   do.

5        Q.   Was he considered a member of

6   management?

7        A.   I would say so, yeah.

8        Q.   How about Penny Fugate?  What was her

9   position?

10        A.   She was -- I would say she is pretty

11   close to management, too, I guess.  You had to do what

12   she said.  But she would collect -- she was in charge

13   of collecting money, the people that owed gas bills.

14        Q.   Did she have people that reported to

15   her?  Was she their supervisor?

16        A.   Mostly us.  I mean, if she called us to

17   do something, we went and did it.

18        Q.   I understand you had to do what she

19   said.  But would she supervise your work in the field?

20        A.   No.  No.

21        Q.   Okay.  When did Troy Thatcher refer to

22   you as grandpa?

23        A.   All the time.  Every day.  You know.

24        Q.   When did he start referring to you as

25   grandpa?

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO  January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 130

1          A.   The exact date, I don't know.  It was

2   when I was having -- I was lifting up a pipe, and I

3   couldn't lift it by myself.  And he said, Here,

4   Grandpa, move off the way, let me do it, you're

5   getting too old for this stuff.  So he went and lifted

6   it.

7          Q.   What did you say to him?

8          A.   I said, Oh, that's good to be a super

9   boy.  I said, I wished I was that way.

10          Q.   So he was helping you by lifting the

11   pipe in that instance?

12          A.   Actually, he was watching me.  And then

13   when I couldn't lift it, then he went and lifted it.

14          Q.   By lifting it he was helping you?

15          A.   Yeah.

16          Q.   I understand.  Did you tell him, Hey,

17   Troy, I don't like being referred to as grandpa?

18          A.   No, sir.

19          Q.   At that time or at any subsequent time?

20          A.   No.  I don't believe I did.

21          Q.   Did you ever refer to yourself as

22   grandpa?

23          A.   No, sir.

24          Q.   Ron Wakefield?  When did he refer to you

25   as grandpa?

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO   January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 131

```
 1            A.   I think Ron did it -- when Troy started
 2   calling me grandpa, Ron did too.
 3            Q.   Did you ever tell Ron, Hey, don't call
 4   me that, I don't like it?
 5            A.   No, sir.
 6            Q.   Were you offended when either Troy
 7   called you that or Ron called you that?
 8            A.   No, sir.
 9            Q.   Pat Maloney.  When did Pat begin
10   referring to you as grandpa?
11            A.   Pretty much the same time, you know.  He
12   heard the other guys do it, and he thought it was
13   funny.  So --
14            Q.   Did you ever tell Pat you didn't care
15   for it?
16            A.   No, sir.
17            Q.   Or that you were offended by being
18   called grandpa?
19            A.   No, sir.
20            Q.   Ask him to stop?
21            A.   No, sir.
22            Q.   Did you ever ask anybody to stop calling
23   you that?
24            A.   No, sir.
25            Q.   Penny Fugate?  When did she start
```

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO   January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 132

1    calling you grandpa?

2         A.   Penny didn't start until probably the

3    last year I was there.   I can't remember the date.

4    But she just -- I think she only did it a couple

5    times.

6         Q.   Did you ever tell her that you were

7    offended by her calling you that?

8         A.   No, sir.

9         Q.   Or ask her to stop?

10        A.   No, sir.

11        Q.   Did you ever complain to anyone in upper

12   management about the fact that people were calling you

13   grandpa and that you didn't like it?

14        A.   No, sir.

15        Q.   Did you ever complain to anyone in HR

16   about the fact that people referred to you as grandpa?

17        A.   No, sir.

18        Q.   Did you ever make a complaint using the

19   company's hotline to complain about the fact that

20   people were calling you grandpa?

21        A.   No, sir.

22        Q.   Did any of the others that you worked

23   with refer to you as grandpa?   Mr. Lucero or Sterling

24   Balliger or JT Duvfa?

25        A.   No.   At the time that I was working with

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO   January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 137

1              A.   No, sir.  I didn't think anybody should
2    have been fired.
3              Q.   Why not?
4              A.   Because it's against OSHA rule.  They
5    are supposed to give you more training, three
6    write-ups.  And then if you still disobey, then it's
7    time to fire.
8              Q.   Where does it say that you have to have
9    three write-ups before you can be fired at Atmos?
10             A.   The company would say it.
11             Q.   The company says that in its progressive
12   discipline policy?  Is that what you're saying?
13                  MR. NEMECHEK:   Objection, form.
14             A.   I believe I read it on there, yeah.  You
15   have to be wrote up, warned and then wrote up.  And if
16   you still keep doing the same thing, then they let you
17   go.
18                  (Exhibit 14 was marked.)
19             Q.   I'm going to hand you what has been
20   marked as Exhibit 14.  Exhibit 14 is a handwritten
21   statement.  I believe that's by you, and your
22   signature is on the first page.  Right?
23             A.   Yes, sir.
24             Q.   The second page is an excerpt from a
25   newspaper article from the Durango paper.  Is that

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO   January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 149

```
 1   foundation.

 2           A.   No, sir.

 3           Q.   Why do you believe that you were

 4   terminated because of your age?

 5           A.   Mostly because I was 60 years old, and I

 6   couldn't see any other reason why they terminated me.

 7   I didn't dig the hole.  I was just doing my job.

 8           Q.   Any other basis for your belief that the

 9   reason you were terminated was your age other than

10   what you've just told me?

11           A.   No, sir, I guess not.

12           Q.   Did Mr. Thatcher ever make a derogatory

13   comment to you about your age?

14           A.   No, sir.  Just calling me grandpa is

15   all.

16           Q.   We have talked about that, right?

17           A.   Uh-huh.

18           Q.   Mr. Murph ever make a derogatory comment

19   to you about your age?

20           A.   No, sir.

21           Q.   Did anyone in upper management above

22   Mr. Murph ever make a derogatory comment to you about

23   your age?

24           A.   Mr. Lee Slushman did one time, I guess,

25   if that's what you want to call it.
```

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO   January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 150

1              Q.    What did he say to you?

2              A.    We were at Crested -- what is that place

3    up here?  Crested Butte.  They had an outage.  We had

4    to go -- they called us in to go over there and

5    relight, which we did.

6                    And at the time I was relighting, we

7    were walking in snow about chest high to me.  And

8    Mr. Slushman said that, you know, I had to be -- take

9    it easy out there, had to be careful.

10                   He said, You are getting up there in

11   age.  He says, I don't want to have somebody find you

12   out there with a heart attack or something.

13             Q.    Mr. Slushman is quite a bit older than

14   you, right?

15             A.    I have no idea.  I don't think so.  I

16   don't know.  His dad is but -- Gary, I don't think

17   Gary is.  I don't know how old Gary is.

18             Q.    Was this statement made by Gary or Lee?

19             A.    Gary.

20             Q.    When did he make that statement?

21             A.    I'm not -- on the Crested Butte outage.

22   I don't remember what day we were on that.

23             Q.    What year?

24             A.    I think it was 2008 or 2007 -- I think

25   it was 2008.  That's the first time I met Russell

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

1    Murph is on that outage.

2           Q.   Did you think Mr. Slushman when he made

3    that comment was concerned for your welfare?

4           A.   That's what I thought at the time.  I

5    told him, Thanks for being concerned, but I'm fine.

6           Q.   Were you offended at the time when he

7    made that comment?

8           A.   No, sir.  I don't get offended easy.

9           Q.   Anybody else in upper management of

10   Atmos Energy ever make a derogatory comment about your

11   age?

12          A.   Not that I can remember.

13          Q.   Did you ever hear Mr. Thatcher or

14   Mr. Murph make a derogatory comment about the age of

15   any other employee?

16          A.    Not in front of me, no, not that I can

17   remember.

18          Q.   Anyone in upper management make a

19   derogatory comment about the age of another employee

20   that you heard?

21          A.   No, sir, not that I can remember.

22          Q.   During the time that Mr. Murph was

23   conducting his investigation, the times when he spoke

24   with you, did he ever make reference to your age in

25   any way?

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO  January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 153

1    yes.

2              Q.   And you know that the Atmos Energy

3    Corporation Code of Conduct contains a provision about

4    respect for people?

5              A.   Yes, sir.

6              Q.   And a section on safety?  You know that?

7              A.   Yes, sir.

8              Q.   Turn to the second page of the document,

9    please, of Exhibit 19.  Under the section Safety, you

10   see that the company says it assigns the highest

11   priority to the safety of its directors, officers,

12   employees, customers, and the public, right?

13             A.   Yes, sir.

14             Q.   And the Code of Conduct goes on to say

15   that any violations of health and safety laws and

16   regulations must be immediately reported to a

17   supervisor or through the company's compliance

18   hotline, right?

19             A.   Yes, sir.

20             Q.   And you never made a safety complaint

21   through the company's compliance hotline, did you?

22             A.   No, sir.

23             Q.   Turn to page 8, please.  Look at the

24   section headed Summary.  Do you see that section?

25             A.   Yes, sir.

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO  January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 154

```
 1              Q.   The third sentence down there says, This
 2   code does not constitute a contract of employment or
 3   create any contractual rights in favor of the company
 4   or any of its employees.  Do you see that statement?
 5              A.   No, I don't.  I lost you.
 6              Q.   Sure.  Paragraph Summary, third sentence
 7   about halfway in:  This Code of Conduct does not
 8   constitute a contract --
 9              A.   Oh, okay.  I see it.
10              Q.   Do you recall reading that when you read
11   the Code of Conduct?
12              A.   Yes, sir, I believe I did.  I didn't
13   know what it meant, but I read it.
14              Q.   Did you ask anyone at the company what
15   that meant after you read it?
16              A.   At the time I was reading it, no,
17   because it was -- everybody was gone.
18              Q.   At any other time?
19              A.   No, sir.
20              (Exhibit 20 was marked.)
21              Q.   Let me hand you what has been marked as
22   Exhibit 20.  Exhibit 20 comes from the Company
23   Handbook Policies and Procedures.  This is the
24   company's safety policy.  Do you recall ever seeing
25   this before?
```

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO   January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 156

```
 1            Q.   You knew it was company policy that

 2   employees strictly comply with OSHA laws and

 3   regulations.  Right?

 4            A.   Yes, sir.

 5            Q.   And with all company safety policies.

 6   Right?

 7            A.   Yes, sir.

 8            Q.   And you knew that it was company policy

 9   that all employees were to immediately report to their

10   supervisors or any available management personnel any

11   actual or potential violation of any Occupational

12   Safety and Health law or regulation.

13            A.   Yes, sir.

14            Q.   And you also knew that all employees

15   were required to immediately report any request or an

16   order to take any action that violated any safety

17   policy or OSHA law or regulation.

18            A.   Yes, sir.

19            Q.   And you knew that any violation of the

20   safety policy, any failure to report, or any false

21   report could lead to disciplinary action, including

22   termination, right?

23            A.   Yes, sir.

24            Q.   How were the company's policies and

25   procedures made available to you, procedures like this
```

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

1    safety policy?

2                 MR. NEMECHEK:  Objection, foundation.

3            A.    Mostly -- mostly through the computer.

4            Q.    Okay.  Were they given to you in hard

5    copy as well?

6            A.    When I first started they were.  And

7    then, like I said, They changed them all the time.

8            Q.    And then they were -- they were kept on

9    the company's Internet on the computer?

10           A.    Yes, sir.  They said it was to save

11   paperwork or something.

12           Q.    And you had access to the company's

13   policies and procedures when you were an employee

14   there.

15           A.    Yes, sir.

16                 (Exhibit 21 was marked.)

17           Q.    Mr. Trujillo, you've been handed what

18   has been marked as Deposition Exhibit 21.  That's an

19   Employee Safety Booklet.  It's a General Guide To A

20   Safe Workplace Environment.  Have you seen that

21   before?

22           A.    I don't remember seeing it.

23           Q.    It has a copyright of 2006.  Was this

24   something that was distributed to all employees at or

25   about that time?

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

1    your recollection that you've seen this brochure

2    before?

3                MR. NEMECHEK:  Objection, form.

4           A.   No, not really.  But I've seen -- I've

5    seen them before, but not for this company.  I've seen

6    it in other companies I've worked for.

7           Q.   Regardless of whether you had seen that

8    before, you were aware of the information that's

9    contained in this section, Trenching, Excavation and

10   Shoring, correct?

11          A.   Yes, sir.

12          Q.   And you knew that there were detailed

13   procedures for trenching, excavation, and shoring

14   contained in the safety manual and that you were

15   supposed to follow those, right?

16          A.   Yes, sir.

17              (Exhibit 22 was marked.)

18          Q.   Let me hand you what has been marked as

19   Deposition Exhibit 22.  This is a report as of

20   4/23/2009 regarding excavation safety competent

21   persons in Durango.  And it reflects training for you

22   on three different dates.

23              First of all on 4/3/2002.  Then if we go

24   down a ways, a refresher course on 2/16/2006, and then

25   another course on 4/28/2008.

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO  January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 160

 1                    You received excavation safety competent

 2    person training on each of those dates, correct?

 3              A.    Yes, sir.

 4              Q.    Were there any other dates that you

 5    received competent person training on?

 6              A.    No, not that I can remember.

 7              Q.    But you don't dispute the information

 8    that is shown here on Deposition Exhibit 22 with

 9    respect to you.

10              A.    No, sir.

11              Q.    Okay.

12                    (Exhibit 23 was marked.)

13              Q.    Let me hand you what has been marked as

14    Exhibit 23.  This is a printout of your training

15    record at Atmos Energy.  Have you ever seen this

16    document before?

17              A.    I seen it on the computer when I took

18    the test.  I never seen this one.

19              Q.    The first section of this, it reflects

20    your certification and licenses, shows that you were

21    certified as a welder, right?

22              A.    Yes, sir.

23              Q.    Then there is a section for operator

24    qualifications.  And you were qualified in a number of

25    tasks, right?

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO  January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 161

```
 1          A.   Yes, sir.
 2          Q.   Okay.  Then we turn back to page 5 of 8
 3    of Exhibit 23.
 4          A.   Okay.
 5          Q.   Toward the bottom of the page, it lists
 6    the courses you had taken.  Correct?
 7          A.   Yes, sir.
 8          Q.   Okay.  And it goes from most recent to
 9    oldest.  Do you see how that works?
10          A.   Yes, sir.
11          Q.   Does this accurately reflect the courses
12    that you took while employed by Atmos Energy, to your
13    recollection, for the time period shown?
14               MR. NEMECHEK:  Objection, foundation.
15    You can answer.
16          A.   I'm sorry.  Repeat that.
17          Q.   Sure.  Is this an accurate listing of
18    the courses that you took at Atmos Energy for the time
19    period that's reflected here?
20          A.   Yes, sir.
21          Q.   So, for example, on page 6 of 8, I think
22    it's been highlighted on this copy, you took an
23    excavation safety course April 28, 2008.  Right?
24          A.   Yes, sir.
25          Q.   And down near the bottom of that page,
```

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO   January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 162

1    you took a trench safety and competent person

2    refresher class on February 16, 2006.   Correct?

3              A.    The one that's highlighted?

4              Q.    Yes, sir.

5              A.    Yes, sir.

6              Q.    And going to the last page, 8 of 8, you

7    took an excavation safety course on April 3, 2002.   I

8    think that's when you were first certified as a

9    competent person, correct?

10             A.    Where at again?

11             Q.    It's on the last page of the document.

12   April 3, 2002.

13             A.    Yes, sir.

14             Q.    Okay.

15                   (Exhibit 24 was marked.)

16             Q.    Mr. Trujillo, let me hand you what has

17   been marked as Exhibit 24.   This is a listing of

18   Durango Safety Meetings and Training for the period

19   April 27, 2009.   It goes all the way back, on the last

20   page, to January 2002.

21                   My first question is have you ever seen

22   this document before?

23             A.    I'm ready.

24             Q.    Do you recall ever seeing this before?

25             A.    No.   I don't remember seeing the paper,

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO  January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 173

 1    Corporation Operations and Maintenance Plan, the

 2    section on safety, and specifically Excavation,

 3    Trenching and Shoring.  Have you ever seen this

 4    standard before?

 5              Take as much time as you need.

 6         A.   I don't remember seeing it.  I mean,

 7    could have been.  I never missed a day of work.  I

 8    don't remember getting paperwork on it, though.

 9         Q.   Do you recall whether these were ever

10    reviewed with you in any of the training sessions you

11    attended on the subject of excavation, trenching, and

12    shoring?

13         A.   I don't remember that far back, sir.

14    Sorry.

15         Q.   Okay.  It's possible that this was

16    reviewed with you; you just don't recall.

17         A.   I just don't recall, yes.

18         Q.   Okay.

19              (Exhibit 30 was marked.)

20         Q.   Mr. Trujillo, let me hand you what has

21    been marked as Exhibit 30.  That's the Atmos Energy

22    Equal Employment Opportunity Policy.  Have you ever

23    seen that before?

24         A.   No, sir.

25         Q.   Was it your understanding that it was

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO  January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 175

```
 1    legal department, or the corporate compliance officer?

 2              A.   Yes, sir.

 3              Q.   And were you aware that if you had any

 4    questions about equal employment opportunity or any

 5    concerns, that you could use the company compliance

 6    hotline?

 7              A.   I wasn't aware we could do that.  But --

 8    it was a chain-of-command thing.

 9                   (Exhibit 31 was marked.)

10              Q.   Let me hand you what has been marked as

11    Exhibit 31.  That's a copy of the company's Behavior

12    and Conduct Policy.  Have you ever seen this before?

13              A.   I seen it for Greeley Gas, yes, sir.

14              Q.   Have you seen it for Atmos Energy?

15              A.   I don't remember seeing it for Atmos.

16              Q.   Do you know whether this was posted on

17    the company's Internet along with its other policies

18    and procedures?

19              A.   I don't remember.

20              Q.   You're not sure one way or another?

21              A.   No, sir.

22              Q.   Were you aware of the fact that Atmos

23    Energy employees are to treat others with respect,

24    honesty, and integrity, recognizing diversity is an

25    opportunity to learn and grow?
```

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

```
 1          A.   Yes, sir.

 2          Q.   Did you know that it was company policy

 3   that employees are to cooperate with management,

 4   fellow employees, and the public?

 5          A.   Yes, sir.

 6          Q.   And that employees are to follow safety

 7   rules and public laws?

 8          A.   Yes, sir.

 9          Q.   And that employees are to treat each

10   other with respect to create a harassment-free

11   workplace?

12          A.   Yes, sir.

13          Q.   And that employees are to follow company

14   policies and guidelines?

15          A.   Yes, sir.

16          (Exhibit 32 was marked.)

17          Q.   Mr. Trujillo, let me hand you what has

18   been marked as Exhibit 32.   That's a copy of the

19   company's Progressive Discipline Policy and

20   Procedures.   Same question.   Have you ever seen that

21   before?

22          A.   I don't recall seeing it, no, sir.

23          Q.   Do you know whether this policy appeared

24   on the company's Internet along with its other

25   policies and procedures?
```

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO  January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 177

1          A.   I don't recall seeing it on the

2    Internet.

3          Q.   You're not sure whether it was on there

4    or not?

5          A.   No, sir.

6          Q.   You mentioned in an earlier answer that

7    you thought you had to receive three warnings before

8    you could be fired.  Do you recall that testimony?

9          A.   No.  I never seen it.  I just heard them

10   talk about it.

11         Q.   Let me direct your attention to

12   paragraph 2 under General Provisions.

13         A.   Okay.

14         Q.   And I want you to look at the

15   sentence -- you can read the entire paragraph, of

16   course.  But I want to direct your attention

17   specifically to the fourth sentence about two-thirds

18   of the way down in that paragraph that starts, In

19   cases of severe misconduct or continued deterioration

20   of behavior, conduct, or performance, immediate

21   dismissal may be necessitated.  Do you see that

22   sentence?

23         A.   Yes, sir.

24         Q.   You understood that that was the

25   company's policy, correct?

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO  January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 178

 1              A.   I never -- I never heard that before.

 2              Q.   Paragraph 3 states, Given the scope and

 3    nature of the employment relationship, it is

 4    impossible to establish specific actions to address

 5    each and every situation that may arise.  Therefore,

 6    these steps serve as general guidelines.  Although

 7    progressive in nature, these actions may be repeated

 8    or skipped whenever appropriate to the situation.

 9              Do you see what I've just read?

10              A.   Pardon me?

11              Q.   Do you see that provision that I've

12    read?

13              A.   Yes, sir.

14              Q.   Were you aware that was the company's

15    policy?

16              A.   No, sir.

17              Q.   Is it your belief that the company

18    somehow violated its policies in terminating you?

19              A.   Yes, sir.

20              Q.   What policy did the company violate?

21              A.   I would say the age and race policy.

22    Safety policy.

23              Q.   Any others?

24              A.   No, not that I can think of.

25              Q.   In terms of the age policy and the race

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO   January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 179

1     policy, it's your belief that the company terminated

2     you unlawfully based on age or race.   Is that a fair

3     statement?

4             A.   Yes.

5             Q.   In terms of the company's safety policy,

6     what policy did the company violate in connection with

7     your termination?

8             A.   I would say the safety policy that day

9     that the hole was dug, because I didn't dig it.

10            Q.   I'm not sure I follow.   Is there a

11    policy that says the company can only fire the person

12    who dug the hole?

13            A.   Well, no, it isn't.   But I mean, it's

14    a -- I mean, why did they blame me for it?   I didn't

15    have nothing to do with the digging.

16            Q.   Okay.   I understand what you're telling

17    me.   But I want you to identify for me the company

18    safety policy that was violated by the company in

19    terminating you in relation to that incident.

20                 MR. NEMECHEK:   Objection, form.   You can

21    answer.

22            A.   Actually, I really don't know.   I don't

23    know the safety policy that they violated there.

24            Q.   Okay.   You can't identify a particular

25    safety policy for me that the company violated in

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO  January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 180

1      connection with your termination?
2              A.    No, sir.
3                    (Exhibit 33 was marked.)
4              Q.    Mr. Trujillo, let me hand you what has
5      been marked as Deposition Exhibit 33.  This is a copy
6      of Plaintiff's Initial Federal Rules of Civil
7      Procedure 26(a)(1) Disclosures in this case.  This is
8      a pleading that was filed by Mr. Nemechek.  And I just
9      want to ask you about a couple items that are listed
10     on here.
11                   Directing your attention to Section A-2
12     at the bottom of the first page.  These are a listing
13     of persons who are likely to have discoverable
14     information relevant to disputed facts alleged with
15     particularity in the pleadings.
16                   One of the persons listed there is
17     Steven G. McNeil.  You referred -- is that the
18     supervisor that we were talking about earlier today?
19             A.    Before Troy, yes.
20             Q.    Okay.  I think you called him Neal.  But
21     it's Steve McNeil?
22             A.    Yes.  I believe that was him.  I can't
23     remember his name, tell you the truth.
24             Q.    Well, my question was why was this
25     person listed there?  And I'm assuming that this was

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO  January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 203

```
 1            A.   They haven't discussed that with me yet.

 2            Q.   Since the time you were terminated from

 3   Atmos, have you looked for jobs in any other fields,

 4   you know, outside the welding field?

 5            A.   No.  Mostly just driving truck and

 6   welding mostly.

 7            Q.   So if I were to look at Exhibit 39 and

 8   Exhibit 40 together, I'd be able to see all the places

 9   that you applied and all the places that you worked

10   since the time you were discharged from Atmos Energy?

11            A.   On Exhibit 40 you would be able to see

12   everywhere I worked and what I made for them.  And the

13   ones that paid me and didn't.

14            (Exhibit 41 was marked.)

15            Q.   Let me hand you what has been marked as

16   Exhibit 41.  This is a copy of an Atmos Energy

17   Corporation Job Description for the title Distribution

18   Operator.  Have you ever seen this before?

19            A.   No, sir.

20            Q.   Take a minute and read through it to

21   yourself, let me know when you're done.

22            A.   Okay.

23            Q.   My question is, does that job

24   description accurately describe the basic function and

25   the primary duties and responsibilities of a
```

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO   January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 204

1    distribution operator?

2              A.   Well, that's what I did.   I never seen

3    this paper before, but that's what I did for them.

4              Q.   Sure.   So the answer is yes.

5              A.   Yes, sir.

6              Q.   That does accurately describe those, the

7    job duties and responsibilities?

8              A.   Yes, sir.

9              Q.   Okay.

10             (Exhibit 42 was marked.)

11             Q.   Mr. Trujillo, let me hand you what has

12   been marked as Exhibit 42.   That's a performance

13   evaluation.   It's for the period 10/1/07 to 10/1/08,

14   and it was prepared by your supervisor at the time,

15   Troy Thatcher.   Do you recognize this document?

16             A.   Yes, sir.

17             Q.   If we turn to the last page of Exhibit

18   42, that's your signature under the section Employee

19   Comments, correct?

20             A.   Yes, sir.

21             Q.   You were given -- and I'm looking at the

22   last page.   The overall rating that Mr. Thatcher gave

23   you on this evaluation was an E, which in this case is

24   a good thing, means exceeding expectations.   Did you

25   agree with that overall performance rating?

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO   January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 205

1           A.   Yes, sir.

2           Q.   Did you think this was a fair

3   performance evaluation?

4           A.   I thought so, yes.

5           Q.   Did you think that with Mr. Thatcher

6   giving you this performance evaluation that he was

7   trying to run you out of the company because of your

8   age or race or national origin or complaining about

9   safety?

10          A.   No, sir.

11               (Exhibit 43 was marked.)

12          Q.   Let me hand you what has been marked as

13   Exhibit 43.   Exhibit 43 is your performance evaluation

14   for the period 10/1/06 to 10/1/07.   And this was done

15   by Dennis Pottorff?

16          A.   Yes, sir.

17          Q.   Have you seen this before?

18          A.   Yes, I have.

19          Q.   If we turn to the last page, again, you

20   see your signature there and the date 10/10/07?

21          A.   Yes, sir.

22          Q.   And Mr. Pottorff gave you an overall

23   rating same as Mr. Thatcher, an E, exceeds

24   expectations, correct?

25          A.   Yes, sir.

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517

HAROLD TRUJILLO   January 20, 2012
Trujillo v. Atmos Energy Corporation

Page 206

1          Q.    Do you think this was a fair performance
2    evaluation?
3          A.    I think so.   Dennis was pretty up-front.
4          Q.    Okay.   And this one also has the
5    signatures of Russell Murph and Dave Good.   Correct?
6          A.    Yes, sir.   I never seen those before,
7    but that is their signatures on there now.
8          Q.    And they would be Pottorff's boss and
9    his boss's boss, right?
10          A.    Yes, sir.
11          Q.    As of the time this was done, October of
12    2007.
13          A.    Yes, sir.
14          Q.    Then there is nothing in this
15    performance evaluation, Deposition Exhibit 43, that
16    would lead you to believe that Pottorff or Murph or
17    Good were looking to run you off because of your age
18    or race or national origin or safety complaints,
19    correct?
20          A.    No, sir.   Not that I can remember.
21                (Exhibit 44 was marked.)
22          Q.    Mr. Trujillo, let me hand you what has
23    been marked as Deposition Exhibit 44.   That's a copy
24    of your performance evaluation for the period October
25    1, 2005, to August 18, 2006.   This one was prepared by

729c4b9b-7cc7-40c3-8fec-7ddb2db8f517